Hobart N. CROCKER, Jr., Plaintiff,

v.

PIEDMONT AVIATION, INC.,
Defendant.

Civ. A. No. 86–1673(RCL).

United States District Court,
District of Columbia.

Aug. 3, 1988.

Pierre Murphy (argued) (Robert M. Beck-man, David M. Kirstein with him, on the brief), Beckman & Kirstein, Washington, D.C., for plaintiff.

Rebecca K. Troth (argued) (Donald T. Bliss with her, on the brief), O'Melveny & Myers, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiff Hobart N. Crocker, Jr. claims he had a right of first hire as a "protected employee" under section 43 of the Airline Deregulation Act of 1978, and that defendant Piedmont's refusal to hire him gives rise to this cause of action. He seeks reinstatement and back pay. Piedmont moves for summary judgment, while Crocker moves for partial summary judgment that he is a protected employee under the Act.

FACTS

Plaintiff Crocker was employed as a pilot by Air New England from 1973 until it ceased operations on October 31, 1981, an apparent victim of Congress' deregulation of the airline industry. On April 6, 1982, Crocker wrote to Piedmont asking its director of personnel to send him a pilot employment application, and enclosing his resume along with a stamped self-addressed envelope which he said were "for your general information and convenience." The two page resume listed a thumbnail employment history, including Crocker's recently completed service with Air New England, although there was no indication why Crocker's employment with the carrier had been terminated. Appendix to Motion for Summary Judgment (App. MSJ), Tab B. Attached to the resume was a page listing various "specialized flying and administrative experience" accumulated by Crocker during his career.

Piedmont sent the requested application to Crocker which he completed, attaching a cover memorandum addressed to L.R. Welch, Jr., Piedmont's Director of Personnel Administration. App. MSJ, Tab C. The memorandum stated that although Crocker was 56 years old, his age should not be a barrier to being hired since he was "a protected employee' under the Employee Protection Program of the Airline Deregu-

lation Act." Crocker brought the completed application to an interview on July 6, during which he met with Welch and another Piedmont official. At the time of the interview, Crocker had failed to take the flight engineers' written exam or obtain a First Class Physical Certificate, but he corrected these apparent deficiencies in his application shortly afterward. Crocker Deposition at 206–208.

Crocker received no offer following the interview, but nonetheless endeavored to keep his application current over the next two years in hopes of eventually receiving employment from Piedmont. Given the importance to this case of whether he did keep his application active or current, this factual issue will be examined closely.

Piedmont's application form states, "Please note that this application will remain active for 6 months from the date it is submitted. It will then be discarded, unless otherwise updated, and the applicant must renew his or her application if still desiring employment." App. MSJ, Tab C. In a form letter to applicants, Welch states "You may update the application information by mail, indicating your continued interest in being employed by Piedmont. Applications are removed from our active files after six months unless updated." App. MSJ, Tab D. In addition, Crocker understood Welch to say orally it was sufficient to just keep Piedmont "abreast, keep us updated as to what you're doing, ..." in order to keep his application on active status. Crocker Deposition at 211–212.

Following the interview, Crocker wrote Welch a series of letters and placed a number of phone calls to his office expressing his continuing desire to work at Piedmont. On September 17, 1982, some two and a half months after the interview, Crocker wrote Welch stating his disappointment that he had heard nothing from him, and saying, "I continue to hope that soon this will be changed and that I will be called for training.... I would welcome the opportunity to work in such an atmosphere and I can assure you that Piedmont would receive my very best efforts and experience." App. MSJ, Tab F.

On May 23, 1983 Crocker wrote again, under the caption "Re: *Letter of Up-date*", informing Welch he had taken a job with a commuter airline, and giving him his new address and phone number. "One fact has not changed however," he said, "and that is my desire to work for Piedmont." Crocker reiterated that he was a protected employee under the Airline Deregulation Act, and asked that Welch call him if he needed any further information on his current employment status. Crocker's anxious desire to work for Piedmont is clearly evident in the letter. *Id.*

On October 27, 1983 Crocker wrote again, again expressing disappointment that he hadn't heard from Welch "in spite of several telephone calls to your office indicating my continued desire for employment with Piedmont," and reiterating his status as a protected employee. "I am still hopeful for a flight crew position, ... I hope that I will hear from you soon." The letter listed a new address in the heading, though this was not pointed out in the body. *Id.*

Crocker wrote again on January 5, 1984, under the caption "Re: *Letter of Up-Date*," giving yet another address (this time listed in the body of the letter) and telephone number, and reiterating his status as a protected employee under the Airline Deregulation Act and his steadfast desire to work for Piedmont. *Id.* This was Crocker's final letter to Welch until Spring, 1986, *id.*, shortly before he filed suit.

There is one other factor in this equation: from July 1, 1982 until March 1, 1984, Piedmont hired only protected employees, or its own personnel as pilots. On the other hand, the parties agreed at oral argument that the carrier hired non-protected employees both before and immediately after that time frame. *See* MSJ at 9–10. Crocker filed this action on June 17, 1986.

DISCUSSION

A. The Airline Deregulation Act of 1978

When Congress dismantled the decades old system regulating the airline industry with the Airline Deregulation Act of 1978 ("ADA"), it recognized that the resulting

economic dislocations might work personal hardships on individual employees, many of whom "have given most of their working lives to the air transportation industry and have too much invested to leave it now. In many cases, a job shift even within the industry would be costly because of lost seniority. Older employees looking for a new job might encounter difficulties because of their age." Senate Report No. 631, 95th Cong.2d Sess. 114 (1978).

As a result, Congress included an employee protection program in section 43 of the ADA, codified at 49 U.S.C. App. § 1552 (1982), which offers substantial protection for certain industry employees. A "protected employee" is any person, other than an officer or director of a corporation, who had been employed for at least 4 years by a covered air carrier on October 24, 1978. § 1552(h)(1). An "eligible" protected employee is one who, on account of a "qualifying dislocation" has been deprived of employment, or has been adversely affected with respect to his compensation. § 1552(a)(1). A "qualifying dislocation" means bankruptcy of the carrier or a "major contraction" resulting in reduction of at least 7½ percent of the total number of full-time employees of the carrier within a 12–month period. §§ 1552(h)(2) and (h)(4).

The protection afforded by the statute was sweeping. First, eligible protected employees were entitled to receive monthly payments from the government for 72 months after a qualifying dislocation, or until the recipient obtained other employment. § 1552(e).

In addition, any

protected employee of [a covered] air carrier ... who is furloughed or otherwise terminated by such an air carrier (other than for cause) prior to the last day of the 10–year period beginning October 24, 1978 shall have first right of hire, regardless of age, in his occupational specialty, by any other [covered] air carrier hiring additional employees.... Each such air carrier hiring additional employees shall have a duty to hire such a person before they hire any other person, except that such air carrier may recall any of its own furloughed employees before hiring such a person. Any employee who is furloughed or otherwise terminated (other than for cause), and who is hired by another air carrier under the provisions of this subsection, shall retain his rights of seniority and right of recall with the air carrier that furloughed or terminated him. § 1552(d)(1).

What appears to be unique about section 43 is that while other legislation prior to this had contained employee protection provisions, none included establishment of a fund from which monthly assistance payments would be made. Senate Report at 206–207. As it turns out, no funds were ever appropriated for the assistance program, and it never became operative. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 1479, 94 L.Ed.2d 661 (1987). However, its inclusion in the statutory scheme may give some insight into Congressional intent regarding the "duty to hire" portion of the employee protection program under § 1552(d)(1).

**B. Private Right of Action Under the ADA**

■ At the outset, the Court notes that Crocker has a private right of action for damages and injunctive relief, based on his claim that Piedmont wrongfully denied him his right of first hire under section 43. *McDonald v. Piedmont Aviation, Inc.*, 625 F.Supp. 762, 766 (S.D.N.Y.1986), *cited with approval in Alaska Airlines, Inc. v. Brock*, 107 S.Ct. at 1482 n. 9.

It might be contended that since section 43(f)(2) required the Secretary of Labor to promulgate regulations within six months of passage of the Act, § 1552(f)(2), and since he failed to do so, the Act's "duty to hire" provision was not operative until he ultimately did. But this possible escape was foreclosed in *Alaska Airlines, Inc.* at 1482 ("The language of [section 43's "duty to hire" ] provisions is sufficiently unambiguous to notify carriers of their responsibilities and sufficiently detailed to require little further action on the part of the Secretary"). In any case, the final regulations were published on November 22, 1983, 48

Fed.Reg. 52, 854 (1983), and took effect 30 days after that, on December 21, 1983. 29 C.F.R. § 220.50(a) (1987). As will be seen, Crocker had a right of first hire by Piedmont·which arose subsequent to that date; therefore, the Secretary's delay in promulgating regulations after the six month deadline has no bearing on Crocker's cause of action.

C. Statute of Limitations

Piedmont vigorously contends that Crocker has not timely filed suit. Since section 43 is a federal statute which has no express statute of limitations, the Court must first decide what period of limitation applies. Normally, a court should apply the limitation period applicable under local law unless "federal law shall otherwise require or provide...." Rules of Decisions Act, 28 U.S.C. § 1652 (1982), *DelCostello v. Int'l. Brotherhood of Teamsters* 462 U.S. 151, 159 n. 13, 103 S.Ct. 2281, 2288 n. 13, 76 L.Ed.2d 476 (1983). The Supreme Court has construed this to mean that the local statute of limitation applies, unless "a rule from elsewhere in federal law clearly provides a closer analogy ..., and when the federal policies at stake and the practicality of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking...." *Id.* at 171–172, 103 S.Ct. at 2294 (the Court rejecting application of the local statute of limitations to a "hybrid" federal civil lawsuit by an employee against his employer and union for violation of a collective bargaining agreement/breach of duty of fair representation).

Piedmont contends here that under *DelCostello*, a cause of action based on section 43 should be governed by the same federal statute of limitations borrowed in that case, namely section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b) (1982), which applies a six month limitation period to actions based on unfair labor practices brought under the NLRA. Piedmont argues in particular that a refusal to hire under section 43 is most analogous to an unlawful refusal to hire based on membership in a labor union under section 8(a)(3) of the NLRA, 29 U.S.C.

§ 158(a)(3) (1982), in that both statutes are federal labor acts that afford protected status to certain employees: the NLRA to members of labor unions, and section 43 to former employees of certain covered airlines; both create a purely statutory right not found in the common law; and both statutes reflect the federal interest in a stable labor market and speedy resolution of labor problems. Further, section 10(b) of the NLRA has been applied by a district court in another circuit to an action brought under Section 43. *Bigelow v. Hawaiian Airlines*, 696 F.Supp. 1356 (D.Haw. 1987).

While deserving of consideration, there are a number of problems with Piedmont's *DelCostello* analysis. To begin with, *Bigelow* was an action by two pilots for "reemployment" only. At 1359. As the *Bigelow* court pointed out,

"Enforcement of any such claims is likely to cause disruptions as the [airline companies] adjust seniority which will necessarily affect all employees hired after the date the protected employee proves that he should have been hired. If actions under [section 43] were governed by a longer statute of limitations, those employees who are adjusted downward on the seniority list will be affected years after they have grown accustomed to the pay and other privileges attendant to their seniority." At 1359.

On the other hand, Crocker seeks both reinstatement and back pay in the present case. While the former remedy may indeed have an impact that reaches beyond the immediate parties, resolution of the back pay claim would appear—and Piedmont has made no showing otherwise—to affect no one but the immediate parties themselves.

This then is the major problem with Piedmont's argument that *DelCostello* requires borrowing section 10(b) of the NLRA: it fails to distinguish between the two remedies Crocker seeks, each of which may have a significantly different impact upon matters of federal policy. The question then is whether Crocker's claim for two

different remedies vindicating a single federal right affects the *DelCostello* analysis, and if so, how.

It is well established that statutes of limitation operate on remedies; they do not extinguish rights. 51 Am.Jur.2d *Limitation of Actions* § 22 (1970). Indeed, a plaintiff who is foreclosed by the statute from seeking one remedy under a particular cause of action, may nonetheless be able to sue for another if a longer limitation period applies to it. *Id.* at § 26. This suggests that the question of timeliness of filing suit by Crocker may have different answers based on the different remedies he seeks.

The Court also notes that Crocker's particular claims here for back pay and reinstatement lie in law and equity respectively, *Saffron v. Department of Navy*, 561 F.2d 938, 943 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978). This is a distinction that continues to matter in questions of timeliness of filing suit, despite the long ago merger of common law and equity procedure in federal courts. If an action were brought exclusively at law, then the question of timeliness of filing was governed by strict application of the appropriate statute of limitations. If brought exclusively in equity, the issue was resolved by application of the equitable doctrine of laches. *Id.* at 941. But if the courts of law and equity had concurrent jurisdiction to enforce the claimant's right, then both remedies had to be brought within the period set by the statute of limitations. *Id.* at 942–943. Further, laches might nevertheless extinguish the equitable remedy even before expiration of the statute. *Patterson v. Hewitt*, 195 U.S. 309, 319, 25 S.Ct. 35, 37, 49 L.Ed. 214 (1904), *cited in Saffron*, 561 F.2d at 942 n. 30.

Therefore, the Court will begin by determining the appropriate statute of limitations to apply to Crocker's claim at law for back pay, and will then apply the above formulation to his equitable claim for reinstatement; that is, it must have been brought within the limitation period applicable to his back pay claim, and perhaps even sooner under the doctrine of laches.

### 1. Crocker's Claim for Back Pay

■❙ To determine a suitable statute of limitations to apply to Crocker's claim for back pay under section 43, this Court must begin by characterizing his claim thereunder. Such characterization is generally a question of federal law. *Agency Holding Corp. v. Malley–Duff & Assoc.*, — U.S. ——, 107 S.Ct. 2759, 2762, 97 L.Ed.2d 121 (1987). Given that Crocker's claim arises solely by virtue of the right created by section 43, and has no basis in decisional or other statutory law, it is therefore an action based on a statute. 53 Am.Jur.2d *Limitation of Actions* § 82 (1970) *Cf. Wilson v. Garcia*, 471 U.S. 261, 278–279, 105 S.Ct. 1938, 1948–1950, 85 L.Ed.2d 254 (1984). In the District of Columbia, 4 D.C. Code Ann. § 12–301(5) (1981) explicitly provides a one year limitation period to actions for a penalty or forfeiture arising under a statute. Since Crocker seeks neither of these, his action would be governed under local law by the three year period contained in § 12–301(8), D.C.'s "catch all" statute of limitations. Although it may seem less than intellectually satisfying to resort to the local "catch all" limitation period, it is the period that must be applied unless the rule of *DelCostello* requires borrowing some other, federal, statute of limitations. *DelCostello* 462 U.S. at 171, 103 S.Ct. at 2294 (resort to state law remains the norm for borrowing of limitation periods). *See Brown v. United States*, 742 F.2d 1498, 1503–1504 (D.C.Cir.1984).

Returning now to Piedmont's arguments in support of borrowing the six month limitation period in section 10(b) under the rule of *DelCostello*, it must be admitted that an action under section 8(a)(3) of the NLRA does indeed provide a closer analogy to Crocker's claim than does any rule under local law. But this by itself is not enough. As Crocker points out, there are a number of other federal labor acts, affording protected status to various other employees, and these are governed by other and often longer limitation periods than that of section 10(b). The fact that such claims are

analogous is not enough, alone, to pick from among their applicable statutes of limitation.

It must also be the case under *DelCostello* that federal policies sought to be furthered by section 43 make section 10(b) a significantly more appropriate statute of limitations than the local one. Piedmont's argument that the NLRA and the ADA both reflect the federal interest in a stable labor market and speedy resolution of labor problems, if true, is true of section 43 only in a far less significant sense. On the one hand, at the very heart of the NLRA is the collective bargaining agreement, to which is crucial "those consensual processes that federal law is chiefly designed to promote—the formation of the [collective bargaining] agreement and the private settlement of disputes under it." *Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 702, 86 S.Ct. 1107, 1111, 16 L.Ed. 2d 192 (1966), *quoted in United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 70–71, 101 S.Ct. 1559, 1567–1568, 67 L.Ed.2d 732 (1981), and *DelCostello* 462 U.S. at 171, 103 S.Ct. at 2294. This consensual process is frequently directly implicated when an employee sues an employer claiming an unfair labor practice.

Crocker's suit for back pay under section 43 carries no such implications, and it can readily be seen that *DelCostello* provides a much more compelling case of a suit that did. In *DelCostello*, an employee/plaintiff brought a federal civil suit against his employer charging violation of the collective bargaining agreement, and also against his union for breach of its duty of fair representation by mishandling the ensuing grievance-and-arbitration proceedings. *Id.* at 154, 103 S.Ct. at 2285. Such an action is not expressly governed by a federal statute of limitations. *Id.* at 158, 103 S.Ct. at 2287.

In deciding what statute of limitations to apply, the Court in *DelCostello* began by observing that plaintiff's claim against his employer was authorized by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), while that against his union was implied under the scheme of the NLRA. *Id.* at 164, 103 S.Ct. at 2290. Cru-

cial to the Court's analysis was that under the terms of the collective bargaining agreement, the plaintiff was first required to submit his dispute to an arbitration proceeding at which he would be represented by his union. Thus, in the subsequent lawsuit it was essential both to his claim against his employer, as well as to his claim against his union, to demonstrate breach of duty of fair representation by his union, *id.* at 165, 103 S.Ct. at 2291, which was the portion of the lawsuit based on the NLRA. The Court reasoned that the plaintiff's lawsuit therefore implicated those federal policies concerned with the private settlement of disputes under a collective bargaining agreement. Further, the plaintiff's action was not closely analogous to any claim under state law. *Id.*

In determining which federal statute would be more closely analogous, the *DelCostello* Court noted that the National Labor Relations Board takes the position that all breaches of a union's duty of fair representation are unfair labor practices in the first place, which would automatically require application of the short six month period under section 10(b) as the appropriate statute of limitations. Without deciding the correctness of the Board's position, the Court noted that "the family resemblance is undeniable, and indeed there is a substantial overlap." *Id.* at 170, 103 S.Ct. at 2293–2294.

But such a close analogy was not, by itself, enough to require borrowing a federal statute of limitations. At least as important were the similar impacts on federal policy of the two causes of action. *Id.* at 170–171, 103 S.Ct. at 2293–2294. The plaintiff in *DelCostello*, just as many plaintiffs who bring suits for unfair labor practices, was challenging the grievance machinery under a collective bargaining agreement, and such a dispute might involve critical terms of the agreement that affect the entire relationship between a company and its union. *Id.* at 168–169, 103 S.Ct. at 2292–2293. "The system, with its heavy emphasis on grievance, arbitration, and the 'law of the shop,' could easily become unworkable if a decision which has given 'meaning and content' to the terms of an

agreement, and even affected subsequent modification of the agreement, could suddenly be called into question as much as [three] years later [under the applicable local statute of limitations]." *DelCostello* at 169, 103 S.Ct. at 2293, *quoting United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 63–64, 101 S.Ct. 1559, 1564–1565, 67 L.Ed.2d 732 (1981).

In vivid contrast, Crocker's claim for back pay does not implicate any grievance or arbitration process under a collective bargaining agreement, which might justify consideration of a shortened limitation period in order to protect federal policy interests. To the contrary, shortening the limitation period to less than three years would seem, if anything, to subvert the policies behind section 43. Although Piedmont correctly points out that the Act's employee protection provisions were intended to provide a "temporary transitional assistance program" for dislocated airline employees, Senate Report at 115, temporary is a relative term. Section 43 is effective for ten years. Further, as originally conceived, it was intended to include funding for monthly assistance payments for protected employees for as long as 6 years. It would be anomalous to shorten the time in which Crocker could bring his claim for back pay against a wrongdoing airline to less than three years, in the interest of furthering federal policy, when federal policy makers anticipated that he could still receive monthly assistance payments from the government well beyond three years.

Therefore, since Piedmont has failed to show that section 10(b) of the NLRA is a significantly more appropriate statute of limitations than the applicable local statute, as required under the rule in *DelCostello*, this Court holds that the three year period of § 12–301(8) will be the limitation period applied to Crocker's claim for back pay. Since Crocker's cause of action arose in March, 1984, and since he filed suit in June, 1986, his claim for back pay is timely filed.

### 2. *Crocker's Claim for Reinstatement*

Under *Bigelow, supra,* Crocker's claim for reinstatement would be barred by the six month statute of limitations contained in Section 10(b) of the NLRA, and this may indeed be the correct result. But it seems the *Bigelow* court's reliance on the doctrine of *DelCostello* in arriving at its holding was misplaced. Central to the decision in *DelCostello* was concern over the potential impact of that lawsuit on the collective bargaining process. Reinstatement of Crocker now might indeed unreasonably disrupt the seniority rankings among Piedmont's employees, and it may well be unfair to Piedmont and its employees for the court now to order such reinstatement, but it would not disrupt their process of "industrial self governance" and thus would not invoke the federal policy concerns articulated in *DelCostello*. For this reason, the Court will apply local law to Crocker's claim for reinstatement as well as to his claim for back pay, since local law appears sufficiently well enough suited to protecting the legitimate interests of Piedmont from untimely filing by Crocker.

■ As described above, Crocker's claim for reinstatement is an equitable one which must likewise be brought within the three year period imposed on Crocker's claim at law for back pay, and even then might still be barred by the doctrine of laches. *Supra* at 689–90. Once the action is brought within the limitation period established at law, it might still be barred if Crocker's delay in bringing it was nonetheless "undue and unexplained" resulting in prejudice to Piedmont, *Clark v. Clark*, 535 A.2d 872, 879 (D.C.1987), and it is here that the concern raised by Piedmont regarding the impact on its seniority system of reinstating Crocker should be considered.

The Court notes that Piedmont has made no factual showing of prejudice in its motion for summary judgment; its representations regarding the effect of Crocker's reinstatement on its seniority system are purely conclusory. Given the flexible and fact intensive nature of laches, the Court will not rule on whether Crocker's claim for reinstatement is barred until Piedmont makes a factual showing of prejudice, and this can be done at trial.

## D. The Merits of Crocker's Claim

 Under section 43, a protected employee has a "first right of hire, regardless of age, in his occupational specialty" by a covered air carrier such as Piedmont whenever it hires additional employees from outside its work force. 49 U.S.C.App. § 1552(d)(1). On the other hand, there is no such right, or any other required preference, if the air carrier is hiring only from a pool of protected employees. Thus, a protected employee's claim arises when, and only when the covered air carrier hires a non-protected employee.

Piedmont concedes that Crocker was a protected employee, and admits that it hired non-protected employees from outside its work force on March 1, 1984. App. MSJ, Tab I, no. 7. Piedmont contends, however, that Crocker did not take sufficient steps to keep his application current that far beyond the initial application and interview in July, 1982. Thus, his application lapsed by the time Piedmont again began hiring non-protected employees almost two years later.

In reaching this conclusion, Piedmont relies particularly on regulations that require the protected employee to make application in accordance with normal carrier procedures, 29 CFR § 220.11(a), in a time and manner required by such carrier. § 220.30(a). Under the regulations, it is also his responsibility to "insure" that an application previously submitted is kept on active status if he wishes it to be considered by the carrier for future vacancies. § 220.30(b). The regulations further allow a covered air carrier to require an eligible protected employee to satisfy "any prerequisites or qualifications determined by it for any vacancy," except that such limitations may not include initial hiring age (unless the protected employee is past retirement age set by the carrier), nor may such prerequisites consider the existence of accumulated seniority, recall rights, or previous experience. § 220.21.

It certainly seems clear enough that at a minimum, it was up to Crocker to apply to Piedmont in order to claim his right of first hire under section 43, to inform Piedmont of his protected status, and to take sufficient steps to keep his application active for as long as he wished to maintain his section 43 rights.

But the process of sifting through the regulations and attempting to divine their meaning and application to these facts seems an unpromising exercise. To begin with, the regulations applicable to what is required of a protected employee to keep an application active seem to exist under a dubious imprimatur. The Act only authorizes the Secretary to issue regulations as may be necessary for the "administration" of the Act, § 1552(f)(1), and which are necessary to "carry out this section." § 1552(f)(2). But this hardly seems a mandate to interpret, much less restrict the statute's provisions regarding covered air carriers' duty to hire, given the fact that the Secretary has no particular role to play in that portion of the employee protection program.

Rather, the secretary's authorization to promulgate regulations is more directly addressed to the monthly assistance payment portion of the act, which the Secretary *was* given explicit latitude to administer. § 1552(b). (Secretary shall compute amount of monthly assistance payments for eligible protected employees, and issue guidelines, after consultation with Secretary of Transportation). The Supreme Court has observed the same distinction. *Alaska Airlines, Inc.* 107 S.Ct. at 1482 n. 10 and accompanying text (contrasting "the independent functioning" of the Act's first hire provision, requiring little further action on the part of the Secretary, with the Secretary's important role in the monthly assistance program).

In any case, it seems a far more relevant exercise to ascertain not the meaning of the regulations as they apply here to the subject of updating Crocker's application, but rather the meaning attached to that subject by the parties themselves. The methods of contract interpretation would, of course, certainly be helpful in ascertaining such meaning. Further, it appears that the law of contract interpretation applies more than just by analogy to these facts.

Crocker and Piedmont squarely addressed the issue of keeping Crocker's application active: Piedmont offered to do so in the form letter included with his application ("You may update the application information by mail, indicating your continued interest in being employed by Piedmont. Applications are removed from our active files after six months unless updated,"); on the application itself ("Please note that this application will remain active for 6 months from the date it is submitted. It will then be discarded, unless otherwise updated, and the applicant must renew his or her application if still desiring employment"); and orally in a communication by Welch to Crocker, to the effect that it was only necessary for Crocker to keep Piedmont "abreast" or updated as to what he was doing.

Further, Crocker accepted or attempted to accept this offer in the series of letters he sent Welch, on September 17, 1982 ("I continue to hope that soon ... I will be called for training."), May 23, 1983 ("Re: *Letter of Up-date*"), October 27, 1983 ("I am still hopeful for a flight crew position, ..."), and January 5, 1984 ("Re: *Letter of Up-date*"). Thus Piedmont offered to keep Crocker's application active if he "updated" it every six months, and Crocker accepted this offer by the letters he subsequently sent, thus creating, or attempting to create a unilateral contract. 1 A. Corbin, *Corbin on Contracts* § 70 (West 1963).

Of course, all of this is to get at a proper way of ascertaining what meaning should be imparted to the term "update," and how the six months requirement should be computed, in deciding whether Crocker took sufficient steps to keep his application active. The term "update" is clearly vague: for example, it could simply mean a brief communication asking that the previously submitted application be kept on file (in which case Crocker was clearly in compliance); or it could require that Crocker inform Piedmont of any changes to information he gave on the application (which Crocker appears to have done); or it could have meant that an entirely new application form be completed and filed, as Pied-

mont contends it did (and which Crocker failed to do).

Further, the "6 months" term appears to have at least two possible meanings: that the application would remain active for six months after it was filed, and then for six months after each update was received; or, that the application would remain active for six months from the time it was first received, and if an update was received within that period, for a subsequent six months, and so forth. Note the crucial difference— under the former meaning, Crocker's updates would not appear to have kept his application active until March, 1984; under the latter, they would have. These then would appear to be material questions for the finder of fact, not properly disposed of on summary judgment.

The jury might find, for example, as Piedmont has suggested, that it is commonly understood in the airline industry that a pilot applicant must submit an entirely new application form each time he wishes to update, and perhaps keep his physical exam results current as well. Or it might find that representations by Welch or his office to Crocker reasonably indicated that far less was required. And of course, it might well find that whatever the terms meant, Piedmont in fact had kept Crocker's file active through March, 1984.

But one other aspect relevant to this issue is striking: Crocker certainly *believed* he was taking the necessary steps to keep his application active with Piedmont, at least through January of 1984; and further, Piedmont was *aware* that Crocker so believed. All four letters to Welch made explicit Crocker's continuing desire to work for Piedmont; the first three referred to their interview in July, 1982; two of the letters contained the explicit caption "Re: *Letter of Up-Date*," and, the last three pointed out his status as a protected employee. From the four letters, Piedmont knew that Crocker was representing himself to be a protected employee, that he desired employment with the carrier, and that he believed he was complying with Piedmont's requirement for keeping his application file active. Under such circumstances, it would be unjust if Piedmont

could now defeat vindication of Crocker's right of first hire on the ground that he failed to update his application.

Even if a jury were to conclude that Crocker misinterpreted the term "update," or the six months requirement, this would only mean that he had not satisfied a condition of Piedmont's offer to keep his application active; namely, the condition that he update every six months. Even so, this does not necessarily excuse performance by Piedmont—such a contractual condition can be waived by an offeror. In particular, it may have been waived here by Piedmont's continuing to receive performance (i.e. the letters from Crocker) with knowledge that the condition had not been performed (that is, the letters did not constitute "updating", and/or they were not timely sent). 3A *Corbin* at § 755, *citing Wenzel & Henoch Const. Co. v. Metrop. Water District.*, 115 F.2d 25 (9th Cir.1940), *cert. denied*, 313 U.S. 560, 61 S.Ct. 834, 85 L.Ed. 1520 (1941) (contractor continued work even though progress payments not made), and *Collins v. Collins*, 348 Mich. 320, 83 N.W.2d 213 (1957) (vendor repeatedly accepted late payments; thus, purchaser could be granted specific performance).

Clearly then, at least at this stage of proceedings, Piedmont can not escape its duty to hire under section 43 by claiming Crocker failed to keep his application active. To the contrary, it seems more likely that Piedmont was obligated to keep Crocker's application active as a matter of contract law, although Crocker has not so moved.

It is therefore

ORDERED, that defendant's motion for summary judgment is denied, and it is further

ORDERED, that plaintiff's motion for partial summary judgment that he is a "protected employee" under section 43, which is unopposed by defendant, is granted.

SO ORDERED.